IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JAMAR ERIK TERRELL,<br><br>Defendant. | CR 19-123-BLG-SPW<br><br>ORDER ON MOTION TO DISMISS |

Before the Court is Defendant Jamar Erik Terrell's Motion to Dismiss the Indictment. (Doc. 24). Terrell asserts that his Sixth Amendment right to a speedy trial has been violated due to the delay between the filing of the Indictment, his subsequent arrest, and the scheduling of trial. (*Id.* at 1–2). The Government opposes the Motion. (Doc. 35).

On November 24, 2025, the Court conducted a hearing at which Senior Inspector Daniel Chilton and Deputy Laura Boll of the United States Marshals Service ("Marshals") testified. Based on the parties' briefing and the testimony presented, the Court finds the material facts are not in dispute.

For the following reasons, the Court grants Terrell's Motion.

/ / /

/ / /

1

## I.    Background

On February 28, 2019, Montana Highway Patrol (MHP) Trooper John Metcalfe conducted a traffic stop of Terrell's vehicle, which resulted in the seizure of six pounds of methamphetamine and 12 pounds of marijuana. (Doc. 35-1 at 5–8). A Montana grand jury returned an Indictment charging Terrell with Possession with Intent to Distribute Controlled Substances in violation of 21 U.S.C. § 841(a)(1) on October 3, 2019. (Doc. 2). A warrant for Terrell's arrest was issued the same day. (Doc. 4).

On October 4, 2019, the warrant was received by the Montana Violent Offender Task Force (MVOTF). (Doc. 26-1 at 2). The MVOTF attempted to locate Terrell on the warrant until May 11, 2020, when responsibility for the search was transferred to the Marshals in Billings. (*Id.*).

Inspector Chilton and Deputy Boll testified that the Marshals repeatedly used Accurint, a data aggregation platform that compiles billions of public and commercial records to build searchable identity profiles, in their efforts to locate Terrell. Accurint assists investigators by linking data such as property records, utility bills, and phone directories to identify individuals, assets, and relationships. Despite its breadth, they testified that Accurint did not yield results on Terrell. From May 11, 2020, through approximately February 10, 2021, deputies pursued various leads in Billings, with no results. (*Id.*).

On approximately February 10, 2021, the Marshals in Billings sought the assistance of the Marshals in Minot, North Dakota. (*Id.*). The Billings Marshals had determined that the most reliable information suggested Terrell resided in North Dakota, based on records showing a residence there, a report of his arrest on a warrant in 2018, and the belief that Terrell's brother lived in that state. (*Id.*).

Deputy Boll pursued leads related to Terrell and his brother's addresses, but her search yielded no results. (*Id.* at 4). In early April 2024, Deputy Boll investigated another lead involving a relative, but that search also proved unsuccessful. (*Id.*).

On May 13, 2025, Deputy Boll discovered a Facebook account belonging to Desiree Benavides that contained several recent photos of Terrell. (*Id.*). Inspector Chilton then used Accurint to conduct a search on Ms. Benavides. (*Id.* at 5). He identified Terrell as an associate of hers and located a recent address for her in Bakersfield. (*Id.*).

The following day, on May 14, 2025, the Marshals in Billings requested assistance from the Marshals in Bakersfield. (*Id.*). The Bakersfield Marshals conducted surveillance at the identified address and observed Terrell discarding trash near a dumpster at an apartment complex. (*Id.* at 6). Terrell was then arrested on his warrant on May 16, 2025. (*Id.*).

3

On July 18, 2025, Terrell entered a not guilty plea at his arraignment in the District of Montana. (Doc. 7). Following arraignment, a jury trial was initially set for September 15, 2025. (Doc. 13).

## II.  Analysis

The Sixth Amendment to the United States Constitution guarantees criminal defendants "the right to a speedy and public trial." In *Barker v. Wingo*, 407 U.S. 514, 530 (1972), the Supreme Court articulated four factors that guide courts in evaluating whether this right has been violated: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of the right, and (4) prejudice to the defendant. The Court reviews each factor in turn and finds Terrell's speedy trial right has been violated.

### A.  *Length of Delay*

"The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker*, 407 U.S. at 530. Delay is measured from "the time of the indictment to the time of trial." *United States v. Sears, Roebuck & Co.*, 877 F.2d 734, 739 (9th Cir. 1989). "Generally, a delay of more than one year is presumptively prejudicial." *United States v. Mendoza*, 530 F.3d 758, 762 (9th Cir. 2008).

Here, the Indictment was filed on October 3, 2019, and trial was originally set

4

for September 15, 2025. The Government concedes that the nearly six-year delay meets the minimum threshold necessary for a judicial inquiry into a speedy trial violation. (Doc. 35 at 6). Therefore, this presumptively prejudicial delay triggers consideration of the remaining three factors.

    B.    *Reason for the Delay*

"The reason for delay is the focal inquiry." *Sears*, 877 F.2d at 739. The Supreme Court has instructed that not all justifications for delay carry the same weight. *Barker*, 407 U.S. at 531. For instance, "[a] deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government." *Id.* By contrast, "[a]lthough negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delay[]." *Doggett v. United States*, 505 U.S. 647, 657 (1992). Where "the government is negligent in pursuing the defendant, prejudice is presumed." *Mendoza*, 530 F.3d at 763.

"The government is not required to make heroic efforts to apprehend a defendant who is purposefully avoiding apprehension." *Id.* (citation modified). If "the defendant seeks to 'avoid detection' . . . and any post-indictment delay can be attributed to him, he waives the right to a speedy trial." *United States v. Sandoval*, 990 F.2d 481, 483 (9th Cir. 1993) (citation omitted).

5

Nonetheless, "[t]he government has 'some obligation' to pursue a defendant and bring him to trial." *Mendoza*, 530 F.3d at 762–63 (quoting *Sandoval*, 990 F.2d at 485). "[I]f the defendant is not attempting to avoid detection and the government makes no serious effort to find him, the government is considered negligent in its pursuit." *Id.* at 763. Conversely, when the government acts with "reasonable diligence," the defendant has no viable speedy trial claim. *Id.*

In *Doggett*, 505 U.S. at 652–53, "[f]or six years, the [g]overnment's investigators made no serious effort to test their progressively more questionable assumption that [the defendant] was living abroad, and, had they done so, they could have found him within minutes." There was no evidence that the defendant knew about his indictment, and the Court concluded that "the [g]overnment's egregious persistence in failing to prosecute [the defendant]" was sufficient to grant relief. *Id.* at 653, 657.

Similarly, in *Mendoza*, 530 F.3d at 763, the Ninth Circuit held that a passive investigation relying only on entry of the arrest warrant in a government database was not diligent. The government made no attempt to inform the defendant of his indictment and simply entered the warrant into law enforcement databases. *Id.* The record was otherwise "silent as to any efforts by the government to apprehend [him]," which the court found insufficient to support a finding of diligence. *Id.* at 764.

District courts have reached similar conclusions. In *United States v. Serrano*, 829 F. Supp. 2d 910, 912–13 (S.D. Cal. 2011), the defendant was "living openly"—filing tax returns, renewing his driver's license, registering a vehicle, and paying utilities under his own name. "[T]he [g]overnment did nothing to locate [the] [d]efendant for the first two years after attempting to execute the warrant," and later relied only on periodic database checks. *Id.* at 913. The court found the government's investigation was insufficient. *Id.*

Likewise, in *United States v. Vasquez*, 15 F. Supp. 3d 1000, 1004–05 (E.D. Cal. 2014), the government attempted to locate the defendant for six months and then relied solely on database entries for 20 months, despite knowing where he lived. The court dismissed the indictment, concluding that the government would have located the defendant "[i]f federal law enforcement had elected to allocate sufficient resources to search for [him]." *Id.* at 1005, 1009. Instead, investigators "ceased all efforts to locate him and simply put the case on the back burner." *Id.* at 1005.

In *United States v. Barragan*, No. 99-cr-20143-BLF-4, 2015 WL 3548532, at *3 (N.D. Cal. June 5, 2025), the government monitored the case and conducted sporadic database checks in 2002 and 2003, with no follow-up at known addresses until 2004. Although the government later engaged in "intensive, albeit short-lived" investigative efforts, the court emphasized that "many obvious and routine measures [had been] overlooked" during the preceding 54 months. *Id.*

7

On the other hand, courts have rejected speedy trial claims where the delay was attributable to the defendant's own conduct. In *United States v. Corona-Verbera*, 509 F.3d 1105, 1115–16 (9th Cir. 2007), the defendant fled to Mexico during a time when "extradition from Mexico on drug related charges . . . was extremely rare." The Ninth Circuit deemed law enforcement's periodic database checks were sufficient under the circumstances, as "the government did not simply forget about [the defendant]." *Id.* at 1116.

In *United States v. Aguirre*, 994 F.2d 1454, 1457 (9th Cir. 1993), the Ninth Circuit found no violation where the defendant knew of the indictment and his obligation to appear but failed to inform law enforcement of his whereabouts. The delay was attributed to the inevitable consequences of the defendant's decision to go into hiding. *Id.* Similarly, in *United States v. Araiza*, 675 F. App'x 740, 743 (9th Cir. 2017), the court found an eight-year delay permissible where the defendant lived under the radar, failed to update his driver's license, and frequently changed addresses.

Here, the Court first observes that certain evidence suggests Terrell was not actively attempting to avoid apprehension. On November 1, 2019, he obtained a California identification card listing a Bakersfield address—unlike the defendant in *Araiza*, who lived "under the radar" and failed to update his driver's license. Terrell also generated official records during the Marshals' investigation, including tax

filings, child support withholdings, his child's birth certificate, and car insurance documents. (*See* Doc. 40 at 2–3). These records demonstrate that Terrell was "living openly," akin to the defendant in *Serrano*.

During the period between indictment and arrest, Terrell's partner, Ms. Benavides, publicly posted numerous photographs of him on Facebook, including images from public outings such as a graduation. He made no changes to his physical appearance and did not appear to leave the country.

Finally, no evidence was presented to suggest that Terrell knew of his indictment, which would have indicated an intent to avoid detection. Terrell emphasizes that he was ultimately arrested while taking out the garbage in broad daylight, underscoring that he was not concealing himself. (*See* Doc. 25 at 12).

At the same time, the Court acknowledges that some evidence indicates Terrell did attempt to evade apprehension. He made no effort to retrieve his vehicle from MHP and maintained no internet or social media presence. Relatives contacted by the Marshals either lacked information or were unwilling to cooperate, which Inspector Chilton testified is typical of individuals seeking to evade detection.

Further, Terrell left no Accurint trail between 2019 and his 2025 arrest. Inspector Chilton and Deputy Boll testified that such records ordinarily reflect updated addresses, vehicle registrations, new associates, or purchase activity. Although entries existed before 2019 and after the arrest, none appeared in the

intervening years. The last listed address in Minot proved fictitious, and all Accurint contacts identified by the Marshals predated the arrest warrant.

On balance, the record contains sufficient evidence that Terrell engaged in conduct consistent with avoiding apprehension, thereby impeding the Marshals' search. Thus, if the Government had searched for Terrell with reasonable diligence, his speedy trial right likely would not have been violated. The Court concludes, however, that the Government failed to do so.

The Government was reasonably diligent at the outset of the investigation. Terrell was indicted and an arrest warrant was issued on October 3, 2019. From October 4, 2019, to May 11, 2020, the MVOTF attempted to locate Terrell. Based on information from MHP and DEA, investigators believed Terrell was living in North Dakota. When the MVOTF could not locate Terrell, it transferred the case to the Marshals in Billings.

From May 11, 2020, to February 10, 2021, the Marshals in Billings pursued the case diligently but without success. They relied heavily on Accurint, which reflected prior arrests and traffic citations in North Dakota, and also searched for associates and relatives on social media. Inspector Chilton testified that leads were difficult to generate because Terrell had no social media presence, no cooperative relatives, and was not local to Billings.

On February 10, 2021, the Billings office sought assistance from the Marshals

in Minot, following a lead that Terrell's brother lived in North Dakota. Deputy Boll investigated potential addresses of Terrell, conducted surveillance, and contacted the Minot Police Department, but found no current information. One listed address did not exist; another was his brother's residence. Attempts to contact Terrell's brother, Derrick, were unsuccessful. Deputy Boll spoke with Derrick's property manager and neighbors, who did not recognize Terrell and reported that Derrick lived alone. When Deputy Boll eventually reached Derrick by phone using a number provided by the Minot Police Department, he hung up after she identified herself. Deputy Boll reported to the Billings office that she had no leads.

After the initial Minot efforts in 2021, Deputy Boll testified that she occasionally looked for associates when in Minot for other matters. Otherwise, the investigation slowed. The next actionable development did not occur until 2024, when Deputy Boll identified another relative.

Despite the lack of progress, the Government continued to concentrate its efforts exclusively on North Dakota. As in *Doggett*, 505 U.S. at 652–53, law enforcement "made no serious effort to test their progressively more questionable assumption" that Terrell remained there.

Inspector Chilton acknowledged that Terrell had associates in multiple states, including California, New Jersey, Texas, and Nevada. Although Bakersfield addresses appeared in Accurint, investigators did not pursue them, concluding that

11

Terrell more likely resided in North Dakota. Inspector Chilton further testified that Accurint later reflected probable California addresses, though the source and timing of that information could not be determined.

The investigation chronology report shows that Deputy Colton Clark of the Billings Marshals checked the FBI's National Data Exchange (N-DEx) and Accurint on February 4, 2022, but uncovered no new leads. (Doc. 26-1 at 9). No further investigative activity was reported beyond this database search—mirroring *Mendoza*, where the record was likewise silent regarding additional efforts to apprehend the defendant.

On November 28, 2022, Deputy Clark revisited the case. Although portions of the report are redacted, he noted a potential Facebook account for Terrell and listed several California connections, including a prior occupation and three Bakersfield addresses. The report reflects that Terrell worked at the California Department of Social Services as recently as 2020. It further indicates that the Marshals were aware of two individuals who might have been Terrell's mother. The first, Stella Santillan, resided in Bakersfield, but the Marshals did not follow up with her.

The report also listed Dolores Terrell ("Dolores") as a possible mother. Dolores lived in Elk Grove, a different city from where Terrell was ultimately found, yet there is no evidence that investigators even attempted to contact her. Even

12

though she was not his mother, she was nonetheless a likely relative who might have provided useful information had the lead been pursued.

Inspector Chilton testified that he believed Terrell had a mother in California but knew little beyond that, other than that Terrell was originally from there. As far as he knew, no effort was made to pursue leads other than Terrell's brother in North Dakota.

Deputy Boll testified that she continued to look for leads periodically, but the next development came only in April 2024, when she identified another relative in Minot. That lead proved fruitless. She stated that until the arrest in May 2025, she searched for new leads every few months. While Deputy Boll made occasional efforts, there is no evidence that the Billings office worked on the case after November 2022 until the May 2025 lead. Notwithstanding that other phases of the investigation may also have been deficient, the gaps from November 2022 and April 2024, and again from April 2024 and May 2025, are too significant to reflect diligence.

The Court finds that sufficient evidence pointed the Government toward California and away from North Dakota—but as in *Barragan*, obvious and routine measures were overlooked. First, specific Bakersfield connections were documented as early as November 2022, as reflected in the investigation chronology report, but they were ignored. Second, Terrell's criminal history revealed strong ties

13

to Bakersfield, including a 2018 conviction for domestic violence with a final disposition date in January 2019. That history, printed on March 12, 2019, and included in the Government's discovery materials, showed close family and partner connections in Bakersfield, but there was no follow-up. A diligent investigation would have included inquiry into Terrell's criminal history, which was already in the Government's possession. Additional evidence—mail in Terrell's vehicle with a Bakersfield address, a California phone number, and his own statements during the traffic stop—though not provided to Inspector Chilton and Deputy Boll, nevertheless reinforced his California ties. Even if North Dakota was initially plausible, once those leads dried up, Bakersfield should have been investigated.

The Government argues that locating Terrell in Bakersfield would have required heroic efforts, given the city's size and the fact that he was not found at the same address as appeared on the mailings in his vehicle. (Doc. 35 at 8). It contends that focusing exclusively on North Dakota was reasonable because Terrell had family there and claimed to be from there. (*Id.*).

The Court disagrees. Once the North Dakota leads had been exhausted, the Government's failure to pursue clear California leads demonstrates a lack of reasonable diligence. Because the Government was negligent in failing to act with reasonable diligence, the reason for the delay is attributed to the Government, and this factor weighs in favor of Terrell.

14

C.   *Terrell's Assertion of His Right*

A defendant's responsibility to assert his right is closely intertwined with the other *Barker* factors. *Barker*, 407 U.S. at 531. The strength of a defendant's efforts to demand a speedy trial "will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice . . . that he experiences." *Id.* Moreover, "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Id.* at 532.

Here, Terrell invoked his right to a speedy trial within one month of his arraignment in the District of Montana. The Government acknowledges that Terrell's filing of the present Motion constitutes an assertion of that right. (Doc. 35 at 9). Therefore, this factor weighs in favor of Terrell.

D.   *Prejudice*

The final *Barker* factor is prejudice. "The Supreme Court has recognized three forms of prejudice that can result from post-indictment delay: (1) oppressive pretrial incarceration, (2) anxiety and concern of the accused, and (3) the possibility that the [accused's] defense will be impaired by dimming memories and loss of exculpatory evidence." *Mendoza*, 530 F.3d at 764 (internal quotation marks omitted) (quoting *Doggett*, 505 U.S. at 654). Pretrial incarceration "has a detrimental impact on the individual," because it hinders the ability to gather evidence, contact witnesses, or otherwise prepare a defense. *Barker*, 407 U.S. at

15

532–33. Defendants may also suffer prejudice "by living under a cloud of anxiety, suspicion, and often hostility." *Id.* at 533.

"Of these forms of prejudice, 'the most serious is the last, because the inability of a defendant [to] adequately . . . prepare his case skews the fairness of the entire system.'" *Doggett*, 505 U.S. at 654 (quoting *Barker*, 407 U.S. at 532). Though it is the most important, it is also "the most difficult . . . to prove because time's erosion of exculpatory evidence and testimony 'can rarely be shown.'" *Id.* at 655 (quoting *Barker*, 407 U.S. at 532).

Here, the first form of prejudice is inapplicable because Terrell was not incarcerated while on warrant status. The second form is likewise inapplicable, as Terrell did not present evidence of anxiety or concern resulting from the delay.

With respect to impairment of the defense, Terrell contends that the locations of the vehicle and the speaker box containing suspected drugs are unknown, raising concerns about the ability to obtain fingerprints. (Doc. 25 at 13). He further asserts uncertainty regarding the whereabouts of other items in the vehicle, including luggage belonging to other occupants. (*Id.*). Terrell speculates that "[e]fforts to investigate all exculpatory facts have been hampered" and that "the passage of time may present an obstacle" to "witness testimony or eyewitness investigation." (*Id.* at 13–14).

The Court finds these assertions insufficient. Although the passage of time

may generally complicate witness testimony or investigation, Terrell has not demonstrated any actual loss impairing his defense. As the Government notes, "[t]he entire encounter with law enforcement on February 28, 2019, was recorded and that recording still exists," and "[t]he recovered drugs still exist." (Doc. 35 at 10). The vehicle was seized by creditors only after Terrell failed to contact MHP regarding its recovery, and its condition at the time of the offense was documented through photographs and video evidence that remain available.

Because Terrell has not demonstrated "specific prejudice to his defense," the Court concludes that the delay does not compromise the reliability of trial, particularly where key evidence and witness testimony remain accessible. *See Doggett*, 505 U.S. at 656.

Nonetheless, the Court's analysis does not end there. Recognizing the difficulty in proving prejudice, the Ninth Circuit has held that "no showing of prejudice is required when the delay is great and attributable to the government." *Mendoza*, 530 F.3d at 764 (quoting *United States v. Shell*, 974 F.2d 1035, 1036 (9th Cir. 1992)). In such cases, prejudice is presumed, and "[t]he presumption . . . intensifies over time." *Id.* (quoting *McNeely v. Blanas*, 336 F.3d 822, 831 (9th Cir. 2003)).

Had "the [G]overnment . . . pursued [Terrell] with reasonable diligence, his speedy trial claim would have failed," as he has not demonstrated specific prejudice

17

to his defense. *See id.* The Government, however, did not act with reasonable diligence. Although the Court does not find that any of the three traditional forms of prejudice are present, the delay was extraordinary and attributable to the Government. "There is, therefore, a strong presumption that [Terrell] suffered prejudice, which the Government has not rebutted." *Id.* at 765. That presumption has only intensified over the course of the six-year delay. Thus, the Court weighs this factor in favor of Terrell.

### E.  *Balancing the* Barker *Factors*

"None of these four factors are either necessary or sufficient, individually, to support a finding that a defendant's speed[y] trial right has been violated." *Mendoza*, 530 F.3d at 762. Instead, these factors "must be considered together with such other circumstances as may be relevant." *Barker*, 407 U.S. at 533.

After weighing the *Barker* factors, the Court concludes that Terrell's Sixth Amendment right to a speedy trial was violated. The substantial delay between indictment and arrest resulted from the Government's negligence, and prejudice is therefore presumed. As a result, a dismissal of Terrell's Indictment is warranted.

## III.  Conclusion

Accordingly, IT IS HEREBY ORDERED that:

(1) Defendant Jamar Erik Terrell's Motion to Dismiss the Indictment (Doc. 24) is GRANTED.

(2)  The Indictment filed in this matter (Doc. 2) is DISMISSED WITH PREJUDICE.

(3)  Defendant Jamar Erik Terrell's Motion to Suppress (Doc. 21) is DENIED AS MOOT.

DATED this 18th day of December, 2025.

*Susan P. Watters*
SUSAN P. WATTERS
United States District Judge